The first matter listed for argument this morning is General Carroll et al. v. E One et al., Mr. Capelli. Good morning, Your Honor. Your Honor, I'd like to reserve two minutes. Great. Please support, counsel. Your Honor, my name is Joe Capelli, and I represent the appellant, General Carroll, and 10 other firefighters who are also appellants in this matter. This case arose from a decision by the lower court awarding costs and fees against the plaintiffs in the amount of $127,000. The crux of the award, according to the opinion entered by the lower court, dealt with the fact that plaintiffs' counsel did not do enough investigation. I'm not sure that the crux was that there was not enough investigation. I think the district court concluded that with respect to at least some of the plaintiffs, there was no investigation. And we would respectfully disagree with that, Your Honor. Let me start because before the district court, you opposed the defendant's motion for costs and fees, and you stated in the second sentence of your memorandum, a defendant attempts to divert the court's attention from the matter at hand by regaling the court with a general history of the mass litigation involving firefighters who are bringing claims against federal signal for occupational hearing loss. That seems to be a rather extravagant characterization since, after all, the very first sentence of Federal Signal's memorandum states, Plaintiffs' counsel did not investigate the hearing loss claims of these plaintiffs before filing suit. Only talking about these plaintiffs. And their nine-page memorandum doesn't even get around to talking about the alleged failures to investigate the merits of other cases until pages 7 and 8. You, on the other hand, explain in the first page of your memorandum that the defendant's discussion of the other cases is wholly irrelevant, but that you've prevailed at trial in other firefighter hearing losses. So what I want to know in hearing loss cases, please explain to me the relevance of the merits of the other cases to the litigation conduct that we had before us in this case. Your Honor, it is what was brought to the attention in the two hearings that were brought in front of the lower court. Defense counsel's national coordinating counsel testified in those two hearings, and his testimony was that this was an ongoing problem with Plaintiffs' counsel's firm in the hearing loss litigation. To give you a little background, if I may, to help answer the question that you posed to me, this litigation consists of 4,000 to 5,000 firefighters, 1,000 plus of which have resolved. During that time, they've been filed in different courts throughout the country. I understand. In fact, interestingly, this is not mass litigation that I was familiar with before this case, but I understand that you and your adversary have been involved, and I've read a lot of the record. You've worked together or opposed to one another in quite a few of these cases across the country. Across the country, Your Honor, and quite frankly, have a reasonable working relationship. And that's what you said previously. And I think the other side would agree with that. That being said, Your Honor, in this, the lower court took the information that was provided in evidence off of the stand, off of their coordinating counsel, who raised the fact that in prior litigation and in different courts across the country, Plaintiffs' counsel has dismissed cases, and the lower court took that into consideration. And it is our belief, and I think that reasonably so, which is what you have already pointed out, that this is really about the conduct that was in front of the lower court here in the Eastern District of Pennsylvania and whether that conduct warranted the award of costs and fees. Well, it is, and my suggestion to you is that that is what the district court was talking about, notwithstanding his reference to other litigation. But let me make sure I'm correct in this. You conceded, it seems, at least implicitly, that the district court did have the authority to attach conditions under Rule 4282. Your Honor, the law is clear on that. So your argument then has to be that what occurred here did not constitute exceptional circumstances. That is correct. And if I may, Your Honor, if you're looking specifically at the case at hand, which is what I believe we should be, looking specifically at the case at hand, the facts that matter in every case of these firefighters, whether it's here or in other courts, there's always an issue of the statute of limitations, because hearing loss is an insidious thing. It doesn't just happen one day, like somebody dropped a piece of wood on your foot, and you know you've got a torture sentence. The district court didn't say, at least specifically, nor did I take it to imply that you hadn't done adequate legal research on the matter of the statute of limitations. The district court found that you, quote, undertook virtually no pre-suit investigation into the potential validity of the plaintiff's claims, and then found that, quote, the history of this case essentially mirrors that of many other cases instituted by plaintiff's counsel against Federal Signal. Now, at least with respect to that first quote that I just recited, is that a clearly erroneous factual determination? I believe it is, Your Honor. Where does the record show that you've done investigation with respect to those claims? If I may, Your Honor, when I questioned coordinating counsel for the defendant, who is involved in all of these cases, the questions that were pertinent dealt with this issue of the statute of limitations and whether we did any investigation on the statute of limitations. That witness at the hearing indicated that this D.C., District of Columbia Fire Department, had a different type of program than the other fire departments. If you had talked to your clients at all, you would have found that out. Well, Your Honor, with all due respect, we do speak to our clients, but our clients... Well, maybe you don't ask the right things of your clients, then. That could possibly be true. But, Your Honor, if you then took a look at their actual deposition testimony of each of these plaintiffs that was deposed, and defense counsel at that hearing, once again, agreed, the testimony is so conflicted because you're talking about a period of 20, 30 years... To get conflicting testimony and confine your focus to what the district court found here, and here's one statement by the district court, which would constitute a finding of fact, that the firefighters, quote, were never told anything about the results of these tests until several years later when they received correspondence from plaintiff's counsel's law firm informing them that they were being named as plaintiffs in this lawsuit. What's in the record that would suggest that that's a clearly erroneous determination? The record is void on that topic, Your Honor. I would agree with you. What about Turner? Does Turner have high frequency hearing loss? Turner had what is called a conductive hearing loss. There was testimony at the hearing from the defense doctor that his hearing loss was related to conductive. The questioning then went on to say, can you have more than one type or one component that causes a hearing loss? So there could be part of that being what is high frequency noise related, but the vast majority, I would concede, was conductive type of hearing loss. Did Turner have high frequency hearing loss? He had hearing loss across the board, Your Honor, low and high frequency. So he did have high frequency hearing loss? He had hearing loss that started at 250 hertz, if I recall correctly, and went up to 6,000 hertz and was basically across the board. The issue then is conductive hearing loss, to be perfectly frank from a medical standpoint, can also cause that high frequency hearing loss. Age can cause that. Noise can cause that. There's a number of components. But clearly his audiogram was more of a conductive nature. But your answer is that he did have high frequency hearing loss? By definition, yes. That's an answer to my question. Yes, he did have high frequency hearing loss. All right. I thought the record indicated at 249 and 556 that he did not. But I could be mistaken on that. I'll hear what opposing counsel has to say on that. The difference, Judge, is that you can have high frequency hearing loss that an expert would say is not noise related, nor age related, but caused by conduction, which is his audiogram was a, without having it in front of me, was a pretty straight across audiogram, which from somebody who looks at audiograms, I will tell you that is most likely caused by conductive hearing loss. The district court held two evidentiary hearings. They did, Your Honor. Correct? Correct. And you maintained with respect to what I think was the May 31, 2016 dismissal, that it was inadvertent that the term without prejudice was used instead of with prejudice. Is that correct? It was, Your Honor. What is there in the record to suggest that it was inadvertent? No witness testified to that from the plaintiffs. You didn't put on any evidence, did you, Your Honor? We didn't, Your Honor. The district court said that, in its opinion, the first time most if not all of the plaintiffs met with or spoke to an attorney from the law firm was when they were deposed. Anything in the record to suggest that that's a clearly erroneous determination? The plaintiffs did not put any testimony in the record at all, Your Honor. Another, the firefighters are not told the results of their tests, unquote, and the suggestion was until months later, if ever. Was that correct? Is that statement correct, Your Honor? Yes, by the district court. That statement is correct, Your Honor. We do not believe, if I may, Your Honor, that any of that is relevant to the issue at hand, quite frankly. You don't think it's relevant to whether or not investigation was conducted or adequate investigation was conducted? Well, we believe to this day that adequate investigation was conducted. Let me ask you this last one then. Again, Judge Joyner finds the firefighters do not learn that they are plaintiffs in an action until after suit is filed and they receive something in the mail from plaintiff's counsel's law firm. That was testimony put forth by the defense, but we did not put any testimony to contradict that, Your Honor. This wasn't a class action where you don't know the members of a class until usually later down the road. This was a complaint on behalf of a number of individual plaintiffs, right? Correct, Your Honor. Since when is it proper practice to file a complaint on behalf of a plaintiff without having met, talked to, investigated, verified the averments that are set forth in the complaint filed on behalf of that plaintiff? Your Honor, I would stress that because we chose not to put evidence on at the evidentiary hearing with respect to the cost and fees, doesn't mean any of the things that you just mentioned didn't occur. Well, it was your opportunity to do so, and it's our decision to make on what's in the record. Yeah, it's sort of like saying, excuse me, if I may, that is one of the most astounding assertions I have heard in all my years, and I have been a judge for 34 years, and you're suggesting that you chose not to put anything in in the way of evidence to refute these intentions, but that we can't come to any conclusion as to what might have actually happened or didn't happen? Judge, I believe that the issue in this case, quite frankly, deals with why there was this alert of costs, and it's specific to the statute of limitations. That's what the defendants raised, and their exact language was claims knowing they were time-marked, and we would suggest to you that the evidence is in the record to show that that is not correct. Well, if you didn't know, then you should have known, and if you say there was adequate investigation, maybe you need something beyond just being told that to make you realize what in the future will be adequate investigation. That could be, Your Honor, but once again, if I may conclude, and my time is up, if I can conclude, Your Honor, if you take a look at the record, what's in the record, and the reason we did not put evidence on is because when the defense attorney indicates in his testimony on the record that there is conflicting testimony in the depositions of each one of the plaintiffs that had to deal with statute of limitations, and that there was a history in this litigation of notions that have been filed in various courts, federal and state, only issued with statute of limitations, and the defense attorney then responds, the court-named defense attorney responds, that very rarely, and I gave percentages down the road on him, did any of those notions get granted. The only thing that made us dismiss this case, quite frankly, is because of the unique program that they had in D.C., we took the deposition of the medical director who locked that up. We had no access to that prior to discovery. That's what this case was about. Do you concede that investigation of these individual claims that arose out of service, you allege, with the D.C. Fire Department could have been determined through investigation? I believe, I'm sorry, Your Honor. Interviewing individual clients and some investigation in advance of the filing of complaint. Interviewing every single client, Your Honor, and having a client fill out a questionnaire besides just interviewing them, would not have given us the information that made us dismiss these cases. If we would allow, if you follow through this logical conclusion, if we would allow these cases to go through to the summary judgment stage and have notions filed, there was, in the record, prior to that deposition of that medical director, and looking at those individual claimants' depositions, there were fact questions that would have got those past summary judgments. It was not until that deposition of the medical director of the D.C. Fire Department, Dr. Malino, came through and basically went down step by step. Let me say, I tried many cases as a lawyer before I became a judge, and I have never run into a case where there was no contact by plaintiff's counsel with the potential plaintiffs, and I find it a case which is unique in my 33 years on the bench. You're younger than I am, Judge Roy. No, I'm not, at heart, maybe. At heart, and the way you act. But it is unique. And, Your Honor, once again, I would remind the court that we chose not to put evidence on, correctly or incorrectly, from this thing. The hear no evil, see no evil defense. I'm as astounded as Chief Judge Smith about that. I mean, this is what we do in court, right? We have to prove our case, and to say we chose to put on no evidence but trust us we win, it's bizarre, isn't it? Your Honor, we looked and focused on one issue in this, and our issue that we focused on was on the issue of why these cases were ultimately dismissed, whether they should have been dismissed under 42 as opposed to 41A, and the issue of the statute of limitations, which is what the defendants raised was the issue that they felt was not investigated. And the evidence that we put forth is the evidence that's actually under us. And those plaintiffs are deposed under oath and questioned by the defense attorney. And those depositions, I believe, lay out what we have to show here, which is that there was conflict with respect to that statute of limitations up until the point that discovery was done on a medical director. And assuming that that conflict existed prior, if they're testifying it in their deposition, their conflict and their memories there, their same thing would be prior. We have no access to the medical director of the D.C. Fire Department until discovery is done. And it was within a week or two after that deposition that we went to the defendants and dismissed this action. All right. We'll have you back on rebuttal, Mr. Caselli. Thank you, Your Honor. Thank you, Mr. Miller. May it please the Court. Counsel, my name is Jan Miller. I represent the defendant, Capelli, Federal Signal Corporation in this matter. Mr. Miller, just setting aside for now, anyway, the procedural history in this case and the facts, if you will, that we were inquiring about with Mr. Capelli, I assume you would concede that there's very little law with respect to the fact that 41A2 and the question it brings us here concerning the award of fees and costs or fees. I would agree with you, Your Honor. And there's no controlling authority, first of all, from the Third, is there? No, not from the Third. Most of the cases that we cited from the circuit that are as analogous to this as we could find are from the Tenth Circuit. Well, I was going to ask you, is Aerotech your strongest authority here? Well, at the circuit court level, perhaps. I think both Aerotech and the Steiner case are both a strong authority. I also think at the district court level, the in-ray asbestos litigation that we have described in our brief or cited in our brief, which is from the Eastern District of Pennsylvania, is also very much on point. In the asbestos litigation, fees were awarded because counsel in that case worked with opposing counsel and the court on a variety of discovery issues, a lot of time, a lot of expenses paid, and then at the end dismisses the case right before the discovery is due. And the court states in that opinion that fees are being given because it basically made the work of the court and the opposing counsel nullified as a result of that. Mr. Capelli concedes that, clearly, the rule permits the award of fees, but it does seem from the case law as well that it is an unusual, rare circumstance where this occurs, and his position is there are no extraordinary circumstances here to award it. What are the extraordinary circumstances? Well, I think the extraordinary circumstances are, as Judge Roth pointed out, I've been practicing over 30 years now, and I have not been involved in a case, either on the plaintiff or the defendant side, where cases have been filed without any discussion, interview, contact of any real substantive nature with the plaintiff. Their answer is that none of that would have mattered. It was immaterial whether they talked to the plaintiffs, because what mattered was the evidence from the doctor, and that was unavailable until the deposition. Was that factually true? No, that's not correct. Why not? Well, I think for two reasons. Number one, had they talked to the plaintiffs, the plaintiffs would have told them about, as they told us at the depositions without any problem, would have told them about the series of tests that had been going on in the D.C. Fire Department for years and years and years, all of the plaintiffs admitted at their depositions. That then, I would presume, would trigger them asking additional questions and perhaps going to the D.C. Fire Department to ask for their own plaintiffs' records. They were entitled to those. They don't have to subpoena them. Their plaintiffs can go in and get their own records from them. In fact, some of the plaintiffs admitted at their depositions, they were given the results anyway. So, no, I do not believe that you need to go to Dr. Malomo for that consideration when the record, again, is uncontroverted that all but one of the plaintiffs admitted two things in their depositions. Number one, that they had been tested for a number of years by the Fire Department, long before the statute of limits, and number two, that they suspected that the noise from their job as firefighters was causing their hearing loss. So, in short, what you're suggesting is that had there been an investigation by plaintiffs' counsel that asked the same questions that were asked during the depositions, this information would have been available to counsel. Correct. All right. A couple other minor points I'd like to bring up for the report, if it please. I know the appeal here is based in large part on the discussion of whether or not it was appropriate for Judge Joyner to consider the other litigation. I was about to ask you that, because there's some language in Errotech that I wanted to ask you about, but you don't seem to be hinging your argument on Errotech. But I'll read it in any event, and that is a sentence that says, of course when a litigant makes a repeated practice of bringing claims and then dismissing them with prejudice after inflicting substantial litigation costs on the opposing party and the judicial system, attorney's fees might be appropriate. What do you make of that? Let me be clear. We are relying on Errotech, but I wanted to get all three of those cases in there, and that's precisely the language in Errotech that we believe is relevant here. If under 41A2 the court, as is clear, is allowed to award fees, obviously these are cases dismissed with prejudice. If you're talking about a situation where a random litigant brings repeated litigation, you're going to be talking almost inevitably at some point about cases being brought in various jurisdictions. It's not necessarily limited at all, and I don't think could be to just that particular court. So I think the language of Errotech opens that up as a possibility. Additionally, I think the fact that what we're talking about here, it is a unique power that the court has. It is one left to the sound discretion of the trial court, and this is a unique situation. And so I think it was appropriate for the court, I think, number one, within the powers of the court, I think it was completely appropriate for Judge Joyner to accept evidence regarding at least generally how these cases were being run. And factually within this specific case, I think that was important. And when you look at his opinion... Well, I asked specifically about his opinion. I'm sure you heard of your adversary, and I read it very carefully. It's short. It's nine pages. But it was at the very end of it that he referred to these other cases. He effectively bolstered his main conclusions by pointing to those other cases. I would agree completely with Your Honor. It's at pages 8 and 9 of his order that he talks about them. And he talks about them. He doesn't even discuss. Judge Joyner does not discuss the dismissal rate on the other cases or anything like that. He merely puts them in to say this case developed. The evidence that was before him showed that this case occurred in the same way that all these other cases occurred. This wasn't an anomaly. And then when he gets to his final conclusion on page 10, he goes back at the end of page 9, goes back to what happened in this case, and he talks about how there was no evidence, and he finds that there was no pre-filing investigation done, there was no interview, et cetera. He says, in view of this evidence, which is undisputed and wholly uncontradicted by the plaintiffs, we believe an award of attorney's fees and costs is properly awarded against plaintiff's counsel here. So I would submit that the complete reading of Judge Joyner's opinion, order, is that his decision was based on what did not happen, what did and did not happen in this very case. To be fair, Mr. Capelli points to what occurred in the Court of Common Pleas of Philadelphia. At one point in his argument, I think it was in his reply brief, and directs our attention to the fact that federal assignment has sought fees and costs in Philadelphia Common Pleas for improper dismissal and its motions were denied by that court. What way, if any, should we give that? I don't think the court should give any weight to that. There is no evidence in the court below as to the circumstances of that particular case. What differences were there procedurally or factually in the Common Pleas case from this case? Well, first of all, factually, it was not a situation where the plaintiffs were told for years and years and years prior to their filing that they had hearing loss and that it was coming from the sirens. So, as both sides agree, D.C. has a unique position, which is why they should have talked to their clients to find out about that. So factually, that's different. Procedurally, I believe that the common court, it was not based, if I recall correctly, and I will tell the court I was not lead counsel on that particular matter, so I'm not as conversant on the facts of that one as I am on this. But I believe it was not based on simply information that was coming from plaintiffs that could have been obtained. It was just a completely different circumstance there, as opposed to this where we have had they talked to their plaintiffs, everything would have come out in the open. I also think that it's very difficult. Appellate counsel also makes a point that in a number of matters where there were dismissals in these cases, we had not moved for fees. And we take the motion for fees exceedingly seriously. And, of course, there have been a number of times cases here have been dismissed in some of this ongoing litigation where we've debated internally about whether to bring this motion or not. But in this case, there's a paper trail between you and the plaintiffs. Yes. If we disagree with you that exceptional circumstances exist as required by 41A2, does that mean reversal is required? I think it does. I would admit to the court that it does. So you've waived or forfeited any right to argue under Goodyear that the inherent powers of the court allowed it to do what it did. I must say I found that strange. You didn't cite Goodyear in your ruling. We did not, Your Honor. We relied exclusively on 41A2. So even if you have a Goodyear argument, you consistently did not raise it. That's correct, Your Honor. Okay. But we can affirm for any reason. That is correct, Your Honor, although I do believe that this case, the factual basis of this case falls squarely within the powers given to the court under 41A. Unless the court has any further questions, I have nothing more to add to my brief. Thank you, Mr. Miller. Thank you. Kelly?  I'm sorry, Your Honor? Rebuttal, sir. Very briefly, Your Honor. The issue, as I say it in listening to Mr. Miller and the questions that you're asking, what is it that we could have done prior, and if we go through it step by step, our plaintiffs, when they testify over that course of talking about their course of their career, and Mr. Miller said this plan is different because this program tested these guys every year, that's not what made the program different. The Philadelphia firefighters are tested every year. The Alameda firefighters, the Buffalo firefighters are tested every year. What made the program different was the fact that there was a medical doctor that sat down with these folks and relayed the information to them about not only the fact that they had a hearing loss for the ones who did, these particular people did, but also that it could be related to their job. Is it in the record that all these other firefighters are tested? I'm sorry, Your Honor. Is it in the record that these firefighters in other locations are all tested every year? No, I'm responding to Mr. Miller. I don't believe that's in the record. I'm responding to Mr. Miller's comment. All right. Well, if it's not in the record, I would advise you not to argue, assuming that it is in the record. What I would say that is in the record is that Mr. Duffy, the Pruitt Native Council, specifically says that this program is different because they have all these other steps that other fire departments don't have, one of which is this Dr. Malamud, who we deposed also, and she testifies to the fact, quite frankly, that they sit down and they tell these people. It is a two-prong test for this group. These people could have talked about that if you had talked to them before you filed the suit. And you are correct, Judge, and they would talk about it, and they would talk about it consistently the same way they talked about it in their deposition, that they remember showing up for a test, that they remember raising their hands when there was a beep. But if you read those depositions thoroughly, Your Honor, with all due respect, they do not give you a consistent answer to a lot of these questions, and that's the point. The point is that's what creates these fact questions. This was different out of the D.C. because of this Dr. Malamud, and that was the difference because, and you say, why didn't we raise these other issues? Quite frankly, the issue is when would we have been able to obtain this information, and the only way, even proved by our depositions of our claimants, is through that medical director. Well, sometimes information can come in a derivative way as well. That is, a client can tell you something that suggests that you need to look deeper and ask something else. And that's what discovery is for me, Your Honor. So a principle investigation before launching the whistle. That's right. Isn't that what Rule 11 was formulated to avoid? That is, you do some investigation beforehand, before you go and file a complaint, and then incur the expenses of litigation. Absolutely, Your Honor. One final question. In my chambers, I try to read the briefs first and then ask my clerks to follow up. And I ask them questions and I provide them a little handwritten memo, which usually they can't read because my penmanship is reputedly deplorable. But in this case, here's what, these are the precise words I used. I think we should look into this to see if plaintiffs' counsel's desire to place the financial rewards of aggregation over the need for investigation was what led to these filings. Why shouldn't we conclude that that's what was behind all of this? I will not say, Your Honor, that anywhere in the civil side doesn't take into consideration financial gain when they bring cases or a case where they would not be in business. However, we take these cases and treat them as individual cases, and there's a history of trying a number of these cases individually, to defense verdicts, to plaintiff's verdicts, taking them up on appeals, having them upheld on appeals, and so forth. And we take our job very seriously. And when we, as once again, looked at this particular issue, the issue here was, was the mistake of filing 3-1 without prejudice, that that warrant, or the conduct thereafter, or there before, warrant the issuance of the costs and fees that were issued. And our position is no, based upon the fact that we would not, no matter what pre-litigation investigation we had done, unless we had access to that medical director, would we have known that this program was such that it was. All right. Thank you. Thank you, Your Honor. I'd like to have a transcript prepared of this whole argument, please. I want to thank counsel, notwithstanding the pointed questions that we've asked and what the panel obviously considers some troublesome facts. We very much appreciate the civil and professional manner in which counsel, in a matter of this kind, have dealt with one another and obviously have historically in these cases. So we commend counsel for that. We'll take the case under advisement. We'll recess to recompose the panel.